# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| **SHANNON PARKER, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **Case No.: 5:20-cv-00217-BO** |
| **K&L ENTERTAINMENT, INC. d/b/a THE GENTLEMEN'S PLAYHOUSE** | ) ) ) | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT** |
| **and** | ) ) | |
| **KRISHAN LAL** | ) | |
| **Defendants.** | | |

## MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Plaintiffs Shannon Parker and Mystery McIntyre ("Plaintiffs") hereby submit their Memorandum in support of their Motion for Default Judgment. In support, Plaintiffs state the following:

### PROCEDURAL BACKGROUND

1. On May 22, 2020, Shannon Parker ("Parker"), on behalf of herself and others similarly situated, filed the above captioned action seeking to recover unpaid wages and statutory damages against Defendant K&L entertainment, LLC d/b/a the Gentlemen's Playhouse ("K&L") and its individual owner, Krishan Lal ("Lal") (collectively, "Defendants"), under Federal and North Carolina law (ECF No. 1).

2. On February 26, 2021, Defendants' Attorneys filed a Motion for Leave to Withdraw (ECF No. 44).

3. On March 4, 2021, the Court granted Defendants' Attorneys Motion for Leave to Withdraw (ECF No. 45). The Order required Defendant Lal to file a notice of self-representation

within 21 days. The Order also required Defendant K&L to have new counsel file their appearance withing 21 days.

4. Defendant Lal did not file a notice of self-representation by March 25, 2021 and Defendant K&L did not have new counsel file their appearance by March 25, 2021.

5. On April 19, 2021, the Court entered an order requiring certain actions by the Defendants (ECF No. 49). The Order required Defendants to fully comply with the production and posting requirements of the Conditional Certification Order within ten (10) days. The Order also required Defendants to cause new counsel to file a notice of appearance, or in the case of Defendant Lal, to file a notice of self-representation within fourteen days.

6. On May 5, 2021, the Court sanctioned the Defendants pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by entering Default against the Defendants (ECF No. 50). This was for their failure to obtain counsel or in the case of Mr. Lal to file a notice of self-representation.

## FACTS IN SUPPORT OF DEFAULT JUDGMENT[1]

1. Plaintiffs worked for Defendant K&L, which was doing business as the Gentlemen's Playhouse. The club is located in Selma, North Carolina. (Parker Dec. ¶2; McIntyre Dec ¶2.)

2. Plaintiff Shannon Parker worked as an exotic dancer at Gentlemen's Playhouse from 2016 through January 2019. (Parker Dec. ¶2.) Plaintiff Mystery McIntyre ("McIntyre") worked as an exotic dancer at Gentlemen's Playhouse from 2002 until December 2019. (McIntyre Dec. ¶2.)

---

[1] Plaintiffs have attached sworn declarations affirming all facts alleged and identified in this section. Declaration of Shannon Parker is attached as Exhibit 1. Declaration of Mystery McIntyre is attached as Exhibit 2.

2

3.     Defendant Lal along with Defendant K&L operated the Gentlemen's Playhouse.[2] (Parker Dec. ¶3; McIntyre Dec. ¶3.)

4.     During the entire period of Plaintiffs' employment with Gentlemen's Playhouse, Plaintiffs were misclassified as independent contractors when they should have been employees under Federal and North Carolina law. (Parker Dec. ¶4; McIntyre Dec. ¶4.)

5.     During the entire period of Plaintiffs' employment, Defendants and their agents made decisions that resulted in Plaintiffs' misclassification as independent contractors when they should have been classified as employees. (Parker Dec. ¶5; McIntyre Dec. ¶5.)

6.     During the entire period of Plaintiffs' employment, Defendants and their agents made decisions that resulted in the implementation of a policy and practice that required Plaintiffs to pay Defendants and/or their management a per-shift fee, surcharge, or kickback, as a mandatory condition of employment for each shift they worked at the Gentlemen's Playhouse strip club. (Parker Dec. ¶6; McIntyre Dec. ¶6.)

7.     At all times during the period of Plaintiffs' employment, Plaintiffs made no investment into the ownership and/or operation of the club. (Parker Dec. ¶7; McIntyre Dec. ¶7.)

8.     During the entire period of Plaintiffs' employment, Defendants and their agents made decisions that resulted in Defendants paying Plaintiffs no wages for exotic dancer work duties performed at the Gentlemen's Playhouse strip club. (Parker Dec. ¶8; McIntyre Dec. ¶8.)

9.     During the period of Plaintiffs' employment at the Gentlemen's Playhouse, Defendants' employees handled and sold pre-packaged snacks and beverages and played music that originated out of the State of North Carolina and otherwise moved in interstate commerce. (Parker Dec. ¶9; McIntyre Dec. ¶9.)

---

[2] As admitted in Defendants' Answer to Complaint at Paragraphs 17 and 25.

3

10.     During the period of Plaintiffs' employment at the Gentlemen's Playhouse, Defendants' employees sold goods and services through the processing of clients' credit cards thereby relying on contractual assurances from processors or third parties outside of North Carolina. (Parker Dec. ¶10; McIntyre Dec. ¶10.)

11.     During the period of Plaintiffs' employment at the Gentlemen's Playhouse, Defendants and their agents advertised to clientele outside of North Carolina on the internet including the use of a Facebook page. (Parker Dec. ¶11; McIntyre Dec. ¶11.)

12.     During the period of Plaintiffs' employment at the Gentlemen's Playhouse, Defendants and their agents played televised sporting events including "pay-per-view" sports that occurred outside of North Carolina. (Parker Dec. ¶12; McIntyre Dec. ¶12.)

13.     During the period of Plaintiffs' employment, Defendants and their agents had clients from outside of North Carolina and catered to this audience in part by being located very close to a major east coast interstate (I-95). (Parker Dec. ¶13; McIntyre Dec. ¶13.)

14.     Based on Plaintiff Parker's personal observations of customers and transactions within the club during each year of her employment, Defendants' Gentlemen's Playhouse strip club had annual gross volume of sales made or business done of not less than $500,000.00, as attested to in Plaintiff Parker's previous affidavit from September 14, 2020, filed as Exhibit 1 at ECF No. 21. (Parker Dec. ¶14.)

15.     During the entire period of Plaintiffs' employment, Defendants and their agents controlled all aspects of the job duties Plaintiffs performed inside the club through employment rules and workplace policies. (Parker Dec. ¶15; McIntyre Dec. ¶14.)

16.     During the entire period of Plaintiffs' employment, Defendants and their agents controlled the method by which Plaintiffs could earn money at the Gentlemen's Playhouse strip

club by establishing dance orders, setting customer prices on private and semi-private exotic dances, and setting private and semi-private dance specials and promotions for customers. (Parker Dec. ¶16; McIntyre Dec. ¶15.)

17.    During the entire period of Plaintiffs' employment, agents of Defendants required Plaintiffs to perform private and semi-private dances under the pricing guidelines, policies, procedures, and promotions set exclusively by Defendants. (Parker Dec. ¶17; McIntyre Dec. ¶16.)

18.    Defendants' agents hired Plaintiffs and, at all times during Plaintiffs' period of employment, Defendants had the ability to discipline, fine, fire, and adjust Plaintiffs' work schedule.  (Parker Dec. ¶18; McIntyre Dec. ¶17.)

19.    At all times during Plaintiffs' period of employment, Defendants, through supervisors and managers, supervised Plaintiffs' job duties to make sure their job performance was of sufficient quality. (Parker Dec. ¶19; McIntyre Dec. ¶18.)

20.    At all times during Plaintiffs' period of employment, Defendants, through their agents, had the right to suspend or send Plaintiffs home and away from the club if Plaintiffs or any other dancer violated rules or policies or if Defendants' management, at its discretion, did not want Plaintiffs to work at the club. (Parker Dec. ¶20; Parker Dec. ¶19.)

21.    At no time during Plaintiffs' period of employment were Plaintiffs required to have or possess any requisite certification, education, or specialized training as a condition of employment with Defendants. (Parker Dec. ¶21; McIntyre Dec. ¶20.)

22.    During the period of Plaintiffs' employment for Gentlemen's Playhouse, the number of hours and shifts Plaintiffs worked varied from week to week. (Parker Dec. ¶22; McIntyre Dec. ¶21.)

5

23.    However, Plaintiff Parker generally worked 3-5 shifts a week for a total of about 18-30 hours per week.  On average, Plaintiff Parker worked about 4 shifts per week for a total of about 24 hours a week. (Parker Dec. ¶22; McIntyre Dec. ¶21.)

24.    Plaintiff McIntyre generally worked 5-7 shifts a week for a total of about 30-42 hours per week.  On average, Plaintiff McIntyre worked about 6 shifts per week for a total of about 36 hours a week. (McIntyre Dec. ¶21.)

25.    All of Plaintiffs' shifts were at night as the club was only open at night. (Parker Dec. ¶22; McIntyre Dec. ¶21.)

26.    Defendants did not track these hours, as they were required to.  Yet agents of the Defendants would have had knowledge of the hours Plaintiffs worked each shift. (Parker Dec. ¶23; McIntyre Dec. ¶22.)

27.    While Plaintiffs were employed as exotic dancers at the Gentlemen's Playhouse, the only form of compensation Plaintiffs received was in the form of tips. (Parker Dec. ¶24; McIntyre Dec. ¶23.)

28.    At all times during Plaintiffs' employment, Defendants totally failed to pay wages or any kind of compensation to Plaintiffs for work duties Plaintiffs performed. (Parker Dec. ¶25; McIntyre Dec. ¶24.)

29.    While Plaintiffs were employed as exotic dancers at the Gentlemen's Playhouse, Plaintiffs were required to pay a house fee or a kick back that ranged from approximately $15.00-$40.00 a night. (Parker Dec. ¶26; McIntyre Dec. ¶25.)

30.    While Plaintiffs were employed as exotic dancers at the Gentlemen's Playhouse, Plaintiffs were required to pay the club a large portion of their tips received from private and semi-

6

private dances, which was an average of at least $100.00 per shift on the low end and often substantially more per shift. (Parker Dec. ¶27; McIntyre Dec. ¶26.)

31.     Plaintiffs provided no written authorization for the Defendants to withhold this portion of their tips. (Parker Dec. ¶28; McIntyre Dec. ¶27.)

32.     On or about November 2019, Plaintiff McIntyre's former lawyer served a letter on Defendants on Plaintiff McIntyre's behalf identifying and describing her individual and class-claim for damages arising out of FLSA and NCWHA violations. In this letter, Plaintiff McIntyre's lawyer presented a settlement demand for her individual claim or, in the alternative, a settlement for the Class claim. (McIntyre Dec. ¶28.)

33.     Following Defendants' receipt of this pre-litigation demand letter, Defendants, by and through its owners, managers, and agents, engaged in unlawful retaliation against Plaintiff McIntyre. (McIntyre Dec. ¶29.)

34.     In retaliation for Plaintiff McIntyre asserting claims against Defendants under the FLSA and NCWHA, Defendant, through its managers, terminated Plaintiff McIntyre's employment and took steps to disparage Plaintiff McIntyre to other local area strip clubs to defame and humiliate her and to ensure that Plaintiff McIntyre would be blackballed and otherwise prevented from working as an exotic dancer at other local strip clubs. (McIntyre Dec. ¶30.)

35.     As a direct result of Defendants' retaliatory actions, Plaintiff McIntyre was terminated from her employment causing her substantial economic loss in the form of lost gratuity earnings and causing her to suffer mental and emotional damages and humiliation. (McIntyre Dec. ¶31.)

36.     There was nothing else Plaintiff McIntyre did that would have caused this termination or Defendants' disparagement of Plaintiff McIntyre. (McIntyre Dec. ¶32.)

37.     Plaintiff McIntyre's employment ended with Gentlemen's Playhouse around December 2019. (McIntyre Dec. ¶33.)

38.     At the time Plaintiff McIntyre, made about an average of $200 a day in tips or from gratuities related to performing dances. (McIntyre Dec. ¶34.)

39.     Because Plaintiff McIntyre was fired, Plaintiff McIntyre missed out on months of gratuities. Plaintiff McIntyre did not regain full time employment until April 2021 when she began to work at a group home.  In this job Plaintiff McIntyre made approximately $1500.00 a month with the extra hours she worked. (McIntyre Dec. ¶35.)

40.     Plaintiff McIntyre worked for about 5 months for 12 hours a week at a dry cleaners. In that job, Plaintiff McIntyre made about $200.00 a week.   This employment started around August 2019 and ended around the beginning of January 2020.  The employment ended because Plaintiff McIntyre quit after experiencing harassment from the manager and his girlfriend. Plaintiff McIntyre did not feel she was able to maintain that employment in those conditions. Shortly thereafter, the pandemic started. (McIntyre Dec. ¶36.)

41.     The overall financial loss from Plaintiff McIntyre from losing her job at Gentlemen's Playhouse caused her great financial hardship.  Because of this, Plaintiff McIntyre had trouble paying her bills and ultimately lost her house.  Plaintiff McIntyre had trouble recovering since then because Plaintiff McIntyre worked for the club for a long time and did not have any relevant work experience in other industries where she was looking for new employment. Things have not been the same for her since then. (McIntyre Dec. ¶37.)

## ARGUMENT FOR LIABILITY AND DAMAGES

Federal Rule 55 establishes a two-step process when a party applies for Default Judgment.  First, the Rule provides that the Court enter Default against a party in certain

circumstances Fed. R. Civ. P. 55(a). In this instance, the Court entered Default against the Defendants as a sanction. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (finding that the court retains inherent power to impose sanctions separate from statutes and rules providing for sanctions). Following the Clerk's Entry of Default, "the plaintiff [then may] seek a default judgment." *Godlove v. Martinsburg Senior Towers, LP*, 2015 U.S. Dist. LEXIS 20291, at *1 (N.D.W. Va. 2015); Fed. R. Civ. P. 55(b). "The Fourth Circuit has a strong policy that cases be decided on their merits." S.E.C. v. Lawbaugh, 359 F. Supp. 2d 418, 420 (D. Md. 2005). However, "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party." *Id*. at 420-22.

In determining whether to grant a motion for Default Judgment, the Court takes as true the well-pleaded factual allegations in the Complaint, other than those pertaining to damages. *See Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001). If the Court finds that "liability is established, [it] must then determine the appropriate amount of damages." *Id*. at 780-81. To do so, "the court may conduct an evidentiary hearing, or may dispense with a hearing if there is an adequate evidentiary basis in the record from which to calculate an award." *Mata v. G.O. Contractors Grp., Ltd*., 2015 U.S. Dist. LEXIS 146976, at *3 (D. Md. 2015); Fed. R. Civ. P. 55(b).

### A.    Plaintiffs Were Defendants' Employees and Were Never Independent Contractors.

Courts have found that under the FLSA and NCWHA, individuals that meet the definition of employer can be held liable for wage payment violations. *Miller v. Colorcraft Printing Co*., 2003 U.S. Dist. LEXIS 20702, at *5 (W.D.N.C. 2003) (NCWHA); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) (FLSA) (stating that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer

9

along with the corporation, jointly and severally liable under the FLSA for unpaid wages."); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999) (FLSA). As such, "corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions" creating the underlying liability, can be held personally liable jointly and severally with the corporate entity. *Donovan*, 712 F.2d at 1514 (citing *Wirtz v. Pure Ice Co.*, 322 F.2d 259, 263 (8th Cir. 1963)).

Under the FLSA and the NCWHA, the Court uses the "economic reality" test to determine whether an individual qualifies as an employer. *Id.*; *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016). Relevant factors under that test "include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Kerr*, 824 F.3d at 83 (citing *Herman*, 172 F.3d at 139). Here, because Defendant Lal, was the owner/operator of Defendants' Gentlemen's Playhouse strip club, with full authority to manage and control the day-to-day operation of the club, including decisions relating to and substantially affecting Plaintiffs' employment, Defendant Lal individually, qualified as Plaintiffs' "employer" and is individually liable under the FLSA and NCWHA.

Relatedly, for Plaintiffs to recover under the FLSA and NCWHA, Plaintiffs must show that they were an "employee" of Defendants. *See Butler v. PP & G, Inc.*, 2013 U.S. Dist. LEXIS 159417, at *2 (D. Md. 2013). The FLSA defines an employee as "any individual employed by an employer" and it defines "employ" as "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), (g). The "employee" standard is identical under North Carolina law as the NCWHA looks to

the FLSA for guidance. *See Garcia v. Frog Island Seafood, Inc*., 644 F.Supp.2d 696, 707 (E.D.N.C. 2009) (citing *Laborers' Int'l Union of N. Am. v. Case Farms, Inc*., 127 N.C. App. 312, 488 S.E.2d 632, 634 (1997)).

The FLSA and NCWHA recognize a difference between employees, which the state and federal law cover, and independent contractors, which the laws do not. *See Schultz v. Capital Int'l Sec., Inc*., 466 F.3d 298, 304 (4th Cir. 2006). Nevertheless, the Supreme Court has noted that "where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

"To determine whether a worker is an employee under the FLSA or the NCWHA, the Court looks to the 'economic realities of the relationship between the worker and the putative employer.'" *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016) (quoting *Schultz*, 466 F.3d at 304). The "economic realities" test examines six factors, none of which is dispositive on its own:

(i)     The degree of control that the putative employer has over the manner in which the work is performed;

(ii)    The worker's opportunities for profit or loss dependent on her managerial skill;

(iii)   The worker's investment in equipment or material, or her employment of other workers;

(iv)    The degree of skill required for the work;

(v)     The permanence of the working relationship; and

(vi)    The degree to which the services rendered are an integral part of the putative employer's business.

11

(hereafter, "the Silk Factors") *Id.* (quoting *Schultz*, 466 F.3d at 304-05). "Rather than looking at one particular factor or applying these factors mechanically, courts look at the totality of the circumstances in applying them." *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000). Application of the test answers "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Schultz*, 466 F.3d at 304 (citing *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947).

### 1.     Degree of Control

As to the first factor, when determining the degree of control an employer club has over an individual dancer at the club, Courts "generally look not only to the guidelines set by the club regarding the entertainers' performances and behavior, but also to the club's control over the atmosphere and clientele." *Butler*, 2013 U.S. Dist. LEXIS 159417, at *4 (finding economic dependence where, even though club did not control the "day-to-day decisions" of its dancers, it still exercised significant control by regulating "the advertising, location, business hours, maintenance of facility, [and] aesthetics"). Courts also have found significant control where clubs establish conduct policies and control performance pricing. *See McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 269 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (finding significant control where club "imposed written guidelines" pertaining to dancer conduct that included requiring dancers to sign-in; pay "tip-in" fee; comply with set prices for private dances; and comply with behavioral guidelines).

In this case, Plaintiffs allege and affirm that: (i) Defendants supervised and controlled all aspects of the job duties Plaintiffs performed inside the club through employment rules and workplace policies; (ii) Defendants controlled the method by which Plaintiffs could earn money

at the Gentlemen's Playhouse strip club by establishing dance orders, setting customer prices on private and semi-private exotic dances, and setting private and semi-private dance specials and promotions for customers; (iii) Defendants required Plaintiffs to perform private and semi-private dances under the pricing guidelines, policies, procedures, and promotions set exclusively by Defendants; (iv) Defendants, through their agents, hired Plaintiffs and had the ability to discipline, fine, fire, and adjust Plaintiffs' work schedule; (v) Defendants, through supervisors and managers, supervised the duties of Plaintiffs to make sure Plaintiffs' job performance was of sufficient quality; (vi) Defendants, through their agents, conducted initial interviews and vetting procedures for Plaintiffs and Defendants' management could deny Plaintiffs access or ability to dance and/or work at the club; and (vii) Defendants had the right to suspend or send Plaintiffs home and away from the club if Plaintiffs or any other dancer violated rules or policies or if Defendants' management, at its discretion, did not want Plaintiffs to work at the club. The foregoing suggests that Plaintiffs were employees of Defendants. *See McFeeley*, 47 F. Supp. 3d at 269; *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 918 (S.D.N.Y. 2013).

### 2. Opportunity for Profit or Loss

Plaintiffs did not have the opportunity for profit or loss while working for Defendants. As noted above, Defendants required Plaintiffs to perform private and semi-private dances under the pricing guidelines, policies, procedures, and promotions set exclusively by Defendants. Therefore, the opportunity for profit or loss was entirely regulated by Defendants. Thus, this factor also weighs in favor of finding Plaintiffs were employees. *See McFeeley*, 47 F. Supp. 3d at 270 (rejecting the argument that exotic dancers can use their "ability to entice customers to give large tips" to increase profits).

### 3. Investment in Equipment or Material

As to the third factor, Courts look at the "investment in equipment or material, or [their] employment of other workers." Schultz, 466 F.3d at 305. Here, Defendants made all the monetary investment into the operation of Defendants' Gentlemen's Playhouse strip club and Plaintiffs made no investment into the ownership and/or operation of the club. As such, this factor favors Plaintiffs' as employees status. *See Schultz*, 466 F.3d at 305.

### 4. Degree of Skill Required

"Courts have held that there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer." *McFeeley*, 47 F. Supp. 3d at 271-72; Butler, 2013 U.S. Dist. LEXIS 159417, at *5. Here, Defendants did not require Plaintiffs to have any specialized skill or education to work as an exotic dancer for Defendants. Therefore, this factor also weighs in favor of Plaintiffs' status as employees. *See McFeeley*, 47 F. Supp. 3d at 241, 241-42.

### 5. Permanence of the Working Relationship

Plaintiff Parker was employed by Defendants as an exotic dancer from 2016 through January 2019. Plaintiff McIntyre was employed by Defendants as an exotic dancer from 2002 through December 2019. These multi-year relationships reflect a permanent relationship, like an employee rather than a limited or specially negotiated engagement as a true independent contractor may negotiate. As such, this factor weighs in favor of employee status.

### 6. Integral Nature of Services Rendered

Plaintiffs were undeniably an integral part of Defendants' business. This Court has stated that "any contention that the exotic dancers were not integral to the operation of [an exotic dance club] flies in the face of logic." *Butler*, 2013 U.S. Dist. LEXIS 159417, at *5. Similarly, Defendants' business could not operate without the employment of exotic dancers. Thus, this

14

factor also weighs in favor of an employee relationship. *See id*.

### 7. Plaintiffs Were Not Independent Contractors

In consideration of the foregoing review of all Silk Factors, and based on the totality of the circumstances, Plaintiffs were employees of Defendants, and were never independent contractors. *See McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 304-05; *see also McFeeley*, 47 F. Supp. 3d at 269; *Butler,* 2013 U.S. Dist. LEXIS 159417, at *4; *Hart*, 967 F. Supp. 2d at 918. As such, and pursuant to the FLSA minimum wage compensation mandate, Plaintiffs were entitled to receive hourly compensation not less than the Federal Minimum Wage, $7.25 per hour, for each hour worked. Similarly, Plaintiff McIntyre was entitled to FLSA anti-retaliation protections.

### B. There is Both Individual and Enterprise Coverage

Defendants were an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), Defendants have had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and Defendants have had and have an annual gross volume of sales made or business done of not less than $500,000. This is because Defendants served out of state customers, worked with third parties from out of state, and sold products produced from out of state as well as having an annual gross volume of sales made or business done of not less than $500,000.00, as attested to in Plaintiff Parker's affidavit from September 14, 2020 filed as Exhibit 1 at ECF No. 21.

Similarly, Plaintiffs were individual employees engaged in commerce or the production of goods within the scope of the FLSA, 29 U.S.C. §§ 206 and 207. The Plaintiffs have established

individual coverage by "showing that she engaged in interstate commerce of the production of goods for interstate commerce." *Foster v. Gold & Silver Private Club, Inc.,* 2015 U.S. Dist. LEXIS 165217, at *15 (W.D. Va. 2015) (internal citations omitted). This coverage exists when an employee "regularly uses instrumentalities of interstate commerce in her work." *Id* (internal quotations omitted). Established precedent has stated that "The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." *Mitchell v. C. W. Vollmer & Co.,* 349 U.S. 427, 429, 75 S. Ct. 860, 862 (1955) (internal citations omitted). Obviously being an exotic dancer at a strip club is so vitally related to the functioning of a strip club, that this would requirement be met.

### C. Defendants are Liable to Plaintiffs for Unpaid Minimum wage Compensation under the FLSA and NCWHA.

The FLSA requires employers to pay their employees at a wage not less than the minimum wage. See 29 U.S.C. § 206. The purpose of the federal statute "is to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (quoting *Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

Here, Plaintiffs' supporting affidavits and well-plead factual allegations, taken as true, establish liability under the FLSA and NCWHA. Here, Plaintiff Parker alleges and affirms that she typically worked an average of 24 hours a week, but Defendants never paid her any wages for hours worked. Plaintiff McIntyre alleges and affirms she typically worked an average of 36 hours a week, but Defendant never paid her any wages for hours worked. Thus, Defendants are liable to Plaintiffs under the FLSA for unpaid minimum wage compensation due and owing

during the 2-year FLSA/NCWHA statutory recovery period.[3] *See Donovan v. Kentwood Dev. Co.*, 549 F. Supp. 480, 485 (D. Md. 1982) (stating that "a prima facie case [for violation of FLSA] can be made through an employee's testimony giving [her] recollection of hours worked").

### D. Defendants Owe Plaintiffs Unpaid Wages and Statutory Damages.

"The Court . . . may rely on affidavits or other evidentiary documents in the record to determine the amount of damages." *Quiroz v. Wilhelm Commercial Builders, Inc.*, 2011 U.S. Dist. LEXIS 132635, at *2 (D. Md. 2011). "The Court may award damages based on Plaintiffs' testimony even though the amounts claimed are only approximated and not perfectly accurate." Lopez v. Lawns R Us, 2008 U.S. Dist. LEXIS 112120, at *3 (D. Md. 2008). In addition, Plaintiffs may recover an amount equivalent to the amount they paid Defendants as a "tip-in" or "house fee" or similarly identified surcharge or per-shift kickback. *See McFeeley v. Jackson St. Entm't, LLC*, 2015 U.S. Dist. LEXIS 58805, at *2 (D. Md. 2015), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (awarding damages for unpaid wages and daily tip-in fees Plaintiffs paid to Defendants).

Here, during the 2-year FLSA/NCWHA statutory recovery period,[4] Plaintiff Parker worked an average of 4 shifts per week for an average total of 24 hours per week. She also paid an average of $127.00 (rounded down) for house kickback fees and in tip sharing. The FLSA requires employers to pay employees <u>free & clear</u> minimum wage of at least $7.25. *See* 29 U.S.C. § 206. Accordingly, Defendants now owe Plaintiff Parker unpaid free & clear FLSA minimum

---

[3] It could be a 3-year recovery if Defendants had willfully violated the FLSA. While Defendants actions may very well be willful, not enough is known to credibly claim this.

[4] The recovery period for Ms. Parker goes back 2 years from the date of the complaint being filed, so it starts on May 22, 2018, and ends January 2019 when her job ended. The two-year period for Ms. McIntyre started 2 years prior to her filing her opt-in. So, her period begins January 4, 2019, and ends when she was fired in December 2019.

17

wage compensation in the amount of $23,495.00, calculated as follows:

| Dates of Employment in 2-Year Recovery Period | Weeks of Employment in 2-Year Recovery Period | Average Shifts Per Week | Average Hours Per Shift | Average Hours Worked Per Week | Federal Minimum Wage | Pre-Kickback Minimum Wage Owed Per Week | Average Tip Deductions / Assignments Per Shift ($27.00 to the "house" & $100.00 in tip sharing) | Average Tip Deduction / Assignment Paid Per Week | Total Free & Clear Minimum Wage Owed Per Week | Total Free & Clear Minimum Wage Owed to Date |
|---|---|---|---|---|---|---|---|---|---|---|
| May 22, 2018 - January 2019 | 37 | 4 | 6 | 24 | $7.25 | $174.00 | $127.00 | $508.00 | $635.00 | $23,495.00 |

Similarly, during the 2-year FLSA/NCWHA statutory recovery period, Plaintiff McIntyre worked an average of 6 shifts per week for an average total of 30 hours per week. She also paid an average of $127.00 (rounded down) for house kickback fees and in tip sharing. Accordingly, Defendants now owe Plaintiff McIntyre unpaid free & clear FLSA minimum wage compensation in the amount of $43,561.00, calculated as follows:

| Dates of Employment in 2-Year Recovery Period | Weeks of Employment in 2-Year Recovery Period | Average Shifts Per Week | Average Hours Per Shift | Average Hours Worked Per Week | Federal Minimum Wage | Pre-Kickback Minimum Wage Owed Per Week | Average Tip Deductions / Assignments Per Shift ($27.00 to the "house" & $100.00 in tip sharing | Average Tip Deduction / Assignment Paid Per Week | Total Free & Clear Minimum Wage Owed Per Week | Total Free & Clear Minimum Wage Owed to Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan 4, 2019 - December 2019 | 49 | 6 | 6 | 36 | $7.25 | $261.00 | $127.00 | $762.00 | $889.00 | $43,561.00 |

The Plaintiffs' claims for liquidated damages are governed by 29 U.S.C. § 216(b) of the FLSA and § 95-25.22 of the NCWHA. Section 216(b) states that an "employer who violates . . . this title shall be liable to the employee or employees affected in the amount of . . . their unpaid … compensation . . . and in an additional equal amount as liquidated damages." Section 95-25.22 states that "[i]n addition to the [unpaid wages] awarded . . . the court shall award liquidated damages in an amount equal to the amount found to be due." Because Plaintiffs' allegations, taken as true by virtue of Defendants' default, establish that Defendants violated the FLSA and

18

the NCWHA, an award of liquidated damages in the same amount is appropriate here. 29 U.S.C. § 216(b); *see also* N.C. Gen. Stat. § 95-25.22; *Earls v. Forga Contracting, Inc*., 2020 U.S. Dist. LEXIS 54761, at *9 (W.D.N.C. March 30, 2020). As such, Plaintiff Parker is entitled to recover unpaid minimum wage compensation in the amount of $23,495.00 plus an additional $23,495.00 in liquidated damages under the NCWHA and/or FLSA for a total of $46,990.00. Plaintiff McIntyre is entitled to recover unpaid minimum wage compensation in the amount of $43,561.00 plus an additional $43,561.00 in liquidated damages under the NCWHA and/or FLSA for a total of $87,122.00.

### E.     Plaintiffs are Entitled to an Award of Attorney's Fees and Costs

In addition to unpaid wages and statutory liquidated damages, Defendants, because they violated the minimum wage or wage payment provisions of the NCWHA, are liable to pay Plaintiffs "costs and fees of the action and reasonable attorney's fees." N.C. Gen Stat. § 95-25.22(d). Likewise, Section 216(b) of the FLSA states that a Court shall, "in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Because Defendants are liable to Plaintiffs under the FLSA and the NCWHA, the Court should award the Plaintiffs their reasonable costs and attorneys' fees for both of those claims. *See Forga Contracting, Inc*., 2020 U.S. Dist. LEXIS 54761, at *23-24.

In calculating an award for attorneys' fees, the Court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp*., 549 F.3d 313, 320-21 (4th Cir. 2008). Plaintiffs request the Court enter an Order that Plaintiffs are entitled to an award of reasonable attorneys' fees and costs to Plaintiffs. <u>To</u>

19

this end, Plaintiff requests leave of the Court to submit a bill of attorneys' fees and costs within fourteen (14) days of the Court's Order of Default Judgment.

### F. Plaintiff McIntyre was Illegally Retaliated Against When She Was Fired

In addition to unpaid wages and statutory liquidated damages, Defendants, because they violated the minimum wage or wage payment provisions of the FLSA, are liable to pay Plaintiff McIntyre for damages in relation to her illegal firing which was a retaliatory action. The FLSA makes it illegal for an employer to:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding.

29 U.S.C. § 215(a)(3). This is know as the retaliation provision.

In interpreting this provision, the 4th Circuit has stated that a Plaintiff must show the following to make a prima facie case under the FLSA:

> 1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action.

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008). Each of the "*Darveau* elements" exist for Plaintiff McIntyre.

Plaintiff McIntyre sent a Demand letter to the Defendants in November 2019. This is clearly a protected action. *See Aguirre v. Joe Theismann's Rest.*, Civil Action No. 1:19-cv-556 (AJT/MSN), 2019 U.S. Dist. LEXIS 238137, at *17 (E.D. Va. July 23, 2019) ("Plaintiffs internal demand letter through counsel clearly qualified as 'filing any complaint' under the FLSA and was therefore protected activity"); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17, 131 S. Ct. 1325, 1336 (2011) (holding that "filed any complaint" includes oral and

written complaints); *Minor v. Bostwick Labs., Inc*., 669 F.3d 428, 438 (4th Cir. 2012) ("the remedial purpose of the FLSA requires intracompany complaints to be considered protected activity within the meaning of its antiretaliation provision").   Therefore, Plaintiff McIntyre has met the first Darveau element.

Plaintiff McIntyre was terminated by the Defendants after sending her Demand Letter. Since "discharge" is contemplated directly by 29 U.S.C. § 215(a)(3), it is clear that this is the kind of adverse action that the retaliation provision would prevent.  Additionally, this would be an adverse action for the second element as described by relevant authority.  Courts typically use the Title VII framework when analyzing the "adverse element" of an FLSA retaliation claim. *Darveau*, 515 F.3d at 341-43.  As explained in *Darveau*, "a plaintiff asserting a retaliation claim under the FLSA need only allege that his employer retaliated against him by engaging in an action 'that would have been materially adverse to a reasonable employee' because the 'employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 343 (quoting *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).  Clearly, being fired is materially adverse to a reasonable employee.  Therefore, Plaintiff McIntyre has met the second *Darveau* element.

As for the causation element, Defendants terminated Plaintiff McIntyre within one month of receiving the Demand letter.  *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (stating that the plaintiff had "demonstrated a casual connection because of the temporal proximity between her complaints" and the adverse action.); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (closeness in time makes a prima facie case of causation).  This one month is

certainly close enough in time to demonstrate this temporary proximity.[5]  Additionally, Defendants, who are in Default have done nothing to rebut this prima facie case for causation. Defendants did not even answer the Second Amended Complaint in which the retaliation count was added.  Therefore, without any additional evidence to rebut the claim of retaliation with a lawful reason for Plaintiff McIntyre's firing, Plaintiff McIntyre has met the third *Darveau* element. Therefore, Plaintiff McIntyre has been illegally retaliated against based on her firing.

### G.    Defendants Owe Plaintiff McIntyre Based on Her Illegal Firing

Under the FLSA, an employer who violates the retaliation provision of 215(a)(3) "shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."  29 U.S. Code § 216(b).  This same provision allows for attorneys' fees and costs as described above.

While the loss of her job greatly effected Plaintiff McIntyre, who lost her house after

---

[5] *See Cox v. U.S. Postal Serv. Fed. Credit Union*, No. GJH-14-3702, 2015 U.S. Dist. LEXIS 78191, 2015 WL 3795926, at *4 (D. Md. June 17, 2015) ("Viewing the facts in the light most favorable to Cox, the Court finds that the temporal proximity between the February meeting and the April termination are close enough in time and circumstance to establish a causal connection."); *Wilkes v. Argueta*, No. 1:16CV260, 2017 U.S. Dist. LEXIS 49964, 2017 WL 1215749, at *5 (M.D.N.C. Mar. 31, 2017) ("Courts have found very close temporal proximity where two months or less lapsed between the alleged protected activity and the adverse employment action." (citations omitted)); *Hines v. Blue Cross & Blue Shield of N. Carolina*, No. 1:19-CV-754, 2020 U.S. Dist. LEXIS 111084, 2020 WL 3452155, at *4 (M.D.N.C. June 24, 2020) (finding, in the FMLA retaliation context, "[t]he Court has previously held that a plaintiff satisfies the third element of a retaliation claim by alleging a gap of approximately two months between the end of her FMLA leave and her termination. The Court holds the same here." (citation omitted)); *Virginia Transformer Corp. v. Ebbert*, No. 7:18-CV-00143, 2019 U.S. Dist. LEXIS 52441, 2019 WL 1415467, at *5 (W.D. Va. Mar. 28, 2019) (finding, in Section 1981 retaliation context, temporal proximity of two months alone was sufficient to satisfy pleading burden).

losing her job, she is mostly looking to claim the tips she would have received as part of her employment, had she been still working. She is also looking to claim the liquidated damages based on these lost tips. The calculation of both of these is as follows:

| Dates Out of Full Time Work (Not Including Work at Dry Cleaners) | Weeks Between Working at Club and Group Home | Average Shifts Per Week at Club | Average Amount Made Per Day at Club | Lost Income While out of Full Time Work | Lost Income With Liquidated Damages |
|---|---|---|---|---|---|
| December 2019 - April 2021 | 70 | 6 | $200.00 | $84,000.00 | $168,000.00 |

While calculating damages due to retaliation is not as clear and there is wider discretion, the above calculation seems like a fair and conservative estimate for Plaintiff McIntyre. At the time of her firing from Gentlemen's Playhouse, Plaintiff McIntyre had two jobs. A part time job at a dry cleaners and the job at Gentlemen's Playhouse. Therefore, the wages she earned from the dry cleaners, were not an offset to the wages she lost from her employment at Gentlemen's Playhouse. Shortly after her firing, the Covid-19 pandemic occurred, making jobs much harder to come by. She also ultimately does not make as much in her new job at the group home as she did for Gentlemen's Playhouse, when including gratuities. Additionally, Defendant's criticism of her to other clubs impacted her ability to work in the one field where she was experienced, causing her to look for a new job with no experience at a tough time. In consideration of all of this including the stress and loss of wages, the above estimate from her direct lost wages from the time she was fired until she regained full-time employment seems like a conservative, yet reasonable amount of damages. Likewise, equal liquidated damages are also requested as above.

Finally, Plaintiffs request the Court enter an Order that Plaintiffs are entitled to an award of reasonable attorneys' fees and costs to Plaintiffs. To this end, Plaintiffs request leave of the

Court to submit a bill of attorneys' fees and costs within fourteen (14) days of the Court's Order of Default Judgment.

## **CONCLUSION**

In consideration of the foregoing, and for good cause show, Plaintiffs request this Honorable Court enter Default Judgment in favor of Plaintiffs against Defendants as follows:

1.      An award of unpaid minimum wage compensation for Plaintiff Parker in the amount of Twenty-Three Thousand Four Hundred and Ninety-Five Dollars and Zero Cents ($23,495.00); plus

2.      An award of statutory liquidated damages for Plaintiff Parker in the amount of Twenty-Three Thousand Four Hundred and Ninety-Five Dollars and Zero Cents ($23,495.00); plus

3.      An award of unpaid minimum wage compensation for Plaintiff McIntyre in the amount of Forty-Three Thousand Five Hundred Sixty-One Dollars and Zero Cents ($43,561.00); plus

4.      An award of statutory liquidated damages for Plaintiff McIntyre in the amount of Forty-Three Thousand and Five Hundred and Sixty-One Dollars and Zero Cents ($43,561.00) based on her unpaid minimum wages; plus

5.      An award of lost earnings for Plaintiff McIntyre in the amount of Eight-Four Thousand Dollars and Zero Cents ($84,000.00) and other relief as found appropriate by the court for her being fired; plus

6.      An award of statutory liquidated damages for Plaintiff McIntyre in the amount of Eighty-Four Thousand Dollars and Zero Cents ($84,000.00) based on her lost earnings from her retaliatory firing; plus

24

7.      An award of attorneys' fees and costs to be determined by post-judgment petition

filed by Plaintiffs' counsel within fourteen (14) days of the Court's Order of Default Judgment.


Respectfully submitted this, August 26, 2021.

/s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr., NCSB # 50276
GIBBONS LAW GROUP, PLLC
14045 Ballantyne Corporate Place, Suite 325
Charlotte, North Carolina 28277
Telephone: (704) 612-0038
Email: phil@gibbonslg.com




/s/ Gregg C. Greenberg
Gregg C. Greenberg, Virginia Bar No. 79610
ZIPIN, AMSTER & GREENBERG, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
Telephone: (301) 587-9373
Email: GGreenberg@ZAGFirm.com

*Attorneys for Named Plaintiffs*
*and the Class / Collective*




## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the word count limitation set forth in Local Rule 7.2(f)(3).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2021 a copy of the foregoing was served on all parties via this Court's CM/ECF system to all counsel of record. A true and correct copy of the foregoing has also been sent via U.S. Mail, postage-paid to the following:

K&L Entertainment, Inc.                     Krishan Lal
200 Graham Street                           805 S. Baines Place
Selma, NC 27576                             Goldsboro, NC 27534

<br>

/s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr.